UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

JASON GREENE,

     Plaintiff,

     v.                        Case No. 3:22-CV-1011-CCB

THOR MOTOR COACH, INC.,

     Defendant.

**OPINION AND ORDER**

Plaintiff Jason Greene purchased a recreational vehicle ("RV") from Defendant Thor Motor Coach, Inc. ("Thor"). The purchase included a 12 month / 15,000 mile limited warranty (the "Limited Warranty"). After purchasing the RV, Greene encountered issues with the RV that led him to seek repairs on several occasions. Some issues remained even after the attempted repairs. Greene thus sued Thor for violation of the Magnuson Moss Warranty Act ("MMWA"), 15 U.S.C. 2301, *et seq.*, breach of express warranty, breach of implied warranty, violation of the Indiana Deceptive Consumer Sales Act ("IDCSA"), Ind. Code § 24-5-0.5-1, *et seq.*, and violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. 201-1, *et seq.*

Before the Court is Thor's motion to exclude the valuation opinion of Greene's expert witness, Mr. Dennis Bailey, and motion for summary judgment on all of Greene's claims. Based on the applicable law, facts, and arguments, Thor's motion to exclude Bailey's valuation opinion is denied, and its motion for summary judgment is granted in part and denied in part.

# I.    FACTUAL BACKGROUND

The following relevant background facts are not in dispute. On December 29

2021, Greene purchased the RV at Camping World RV Sales Indianapolis, Indiana. (ECF

27-1 at 12). The RV came with a Limited Warranty. (ECF 27-2 at 11-30). The Limited

Warranty included a repair remedy. Under its terms, Thor's "sole and exclusive

obligation is to repair any covered defects discovered within the warranty coverage

period if: (1) within ten (10) days of your discovery of a defect you notify TMC or an

authorized dealership of the defect; (2) AND you deliver your motorhome to TMC or an

authorized dealership (at your expense), provided, however, that at TMC's election it

may require you to deliver the motorhome to its facilities in Indiana or to another

authorized service center or dealership for certain repairs." (*Id*. at 21) (emphasis in

original). The Limited Warranty also included a back-up remedy. The back-up remedy

states that if the repair remedy does not successfully cure a defect "after a reasonable

number of repair attempts," then the purchaser's only remaining remedy is to have

Thor pay an independent service shop of the purchaser's choice to perform repairs or, if

the defect is incurable, have Thor pay diminished value damages. (*Id*.) The Limited

Warranty also states that before the purchaser can pursue other legal or equitable

remedies for breach of the warranty or breach of any implied warranty, both the repair

and back-up remedy must be exhausted, and both remedies must have failed to fulfill

their essential purpose. (*Id*.) The Limited Warranty contains a choice-of-law provision

that says the Limited Warranty "shall be interpreted and construed in accordance with

the laws of the State of Indiana. Any and all claims, controversies and causes of action

arising out of or related to this limited warranty, whether sounding in contract, tort, or statute, shall be governed by the laws of the State of Indiana[.]" (*Id.*).

During the warranty coverage period, Greene took the RV in for repairs several times. The following is an undisputed chronology:

- Around December 29 or 30, 2021,[1] Greene took the RV to Camping World of Indianapolis, a Thor-authorized service dealer, for repairs. (ECF 37-8; ECF 27-1 at 13).

- On April 11, 2022, Greene took the RV to Camping World of Pittsburgh, another Thor-authorized service dealer, for repairs. (ECF 27-1 at 54-61).

- On May 6, 2022, Greene picked the RV up from Camping World of Pittsburgh before repairs were complete. (ECF 37-1 at 5).

- Around May 7 or May 9, 2022,[2] Greene took the RV to Fyda Freightliner Pittsburgh for repairs. (ECF 37-1 at 6; ECF 27-1 at 64).

- On or around May 14 or May 16, 2022, Greene returned the RV to Fyda Freightliner Pittsburgh for, among other things, repairs to the dash A/C, and Thor reimbursed Greene for those repairs. (ECF 37-14; ECF 37-1 at 6-7).

- On May 21, 2022, Greene returned the RV to Camping World RV Sales Pittsburgh for repairs. (ECF 37-1 at 7-8).[3]

- On May 24, 2022, Greene picked up the RV from Camping World so he could take it for vacation for about two weeks. (ECF 37-1 at 8).

---

[1] Greene asserts that he took the RV for repairs on the same day that he purchased it on December 29, 2021. However, the work order for this service visit is dated December 30, 2021. Whether the date was December 29 or December 30 is not material for purposes of ruling on the motions.

[2] Greene asserts he took the RV for repairs on May 7, while the Fyda Freightliner Pittsburgh work order shows a "date in" of May 9, 2022. Whether the date was May 7 or May 9 is not material for purposes of ruling on the motions.

[3] As discussed in more detail in the Opinion and Order, Thor disputes whether the return of the RV on May 21, 2022 constitutes a separate repair opportunity. But Thor does not dispute that Greene brought the RV back to Camping World on that day.

- On July 6, 2022, Greene returned the RV to Camping World of Pittsburgh.[4] (ECF 37-18 at 1).

- On July 11, 2022, Camping World Pittsburgh emailed Thor that repairs were complete, and that Thor was welcome to pick up the RV and transport it back to the Thor factory. (ECF 37-25). Greene had previously been in discussion with Thor about factory service and related matters on June 24, 2022, and up to July 5, 2022. (ECF 37-23; ECF 37-24). After Camping World of Pittsburgh informed Thor that repairs were complete, a Thor representative, Rick Koelndorfer, completed a Factory Service Appointment form on July 12, 2022. (ECF 37-27). However, on July 15, 2022, Koelndorfer emailed Camping World of Pittsburgh that there was not enough time to get the RV back to the Thor factory before Greene's vacation on July 29, 2022, and requesting service for Greene's RV related to four issues. (ECF 37-28 at 10-11).

- On July 20, 2022, Camping World of Pittsburgh began a work order for some repairs, and those were completed around August 5, 2022 or August 8, 2022. (ECF 37-19).

- On October 17, 2022, Camping World RV Sales Pittsburgh performed some service repairs. (ECF 37-20 at 1).

On December 13, 2022, Greene sued Thor, alleging that Thor breached the warranty, and engaged in unfair and deceptive conduct in violation of Indiana and Pennsylvania consumer protection laws. Greene alleges that several defects remain unrepaired despite Thor having a reasonable opportunity to make repairs, and that Greene fulfilled his obligations required under the Limited Warranty's back-up remedy.

## II.    STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[4] Thor also disputes whether this is another repair opportunity, arguing that Camping World was still completing work from Greene's first service visit. But Thor does not dispute that Greene returned the RV to Camping World of Pittsburgh on July 6, 2022.

4

matter of law." *Fed. R. Civ. P. 56(a)*. A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

To determine whether a genuine dispute of material fact exists, the Court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). The court must not "sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). The court does not have to conduct research or develop arguments for parties either. *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011); *see also United States v. Beavers*, 756 F.3d 1044, 1059 (7th Cir. 2014) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived.").

"To defeat a motion for summary judgment, the non-moving party cannot rest on the mere allegations or denials contained in his pleadings, but must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (internal quotations omitted), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). "Summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events."

*Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted);

*see also Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

## III.   ANALYSIS

### A.  Thor's motion to strike Dennis Bailey's valuation opinion

Thor seeks to exclude the proposed valuation opinions of Greene's proffered

expert, Mr. Dennis Bailey, arguing that Bailey's opinion is unreliable. (ECF 23). Under

Fed. R. Evid 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> (b) the testimony is based on sufficient facts or data;
>>
>> (c) the testimony is the product of reliable principles and methods; and
>>
>> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Court is required to perform a gatekeeping function before admitting such

testimony to ensure that the testimony or evidence is relevant and reliable. *Daubert v.*

*Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Before admitting expert testimony,

the court "must determine whether the witness is qualified; whether the expert's

methodology is scientifically reliable; and whether the testimony will assist the trier of

fact to understand the evidence or to determine a fact in issue." *Gopalratnam v. Hewlett-*

*Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (internal quotation omitted). The expert's

proponent has the burden to establish the admissibility of an expert's testimony by a

preponderance of the evidence. *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019). In assessing the admissibility of the expert opinion, the Court focuses "solely on the principles and methodology, not the conclusions they generate." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013).

Mr. Greene purchased the RV for $249,901.59. (ECF 24-1 at 60). In Mr. Bailey's report, he opines that, after considering the purported defects, the fair market value of the RV at the time it was purchased was $100,000.00. (*Id.*) Thor does not challenge Bailey's qualifications, but argues that Bailey's valuation opinion is inadmissible because it is mere *ipse dixit* and fails to meet the reliability standards required under Fed. R. Evid. 702 and *Daubert*. Thor argues that Bailey's "valuation opinions do not use [his] technical knowledge to apply reliable principles to known data" and that Bailey's appraisal "does not rely on any testable, repeatable, or even describable methodology. He simply looks at the facts, mulls them over in light of his experience, and posits a conclusion on value." (ECF 24 at 3,4).

Bailey relies heavily on his experience in reaching his valuation opinion. But "[i]n certain fields, experience is the predominant, if not the sole, basis for a great deal of expert testimony." *United States v. Allen*, 269 F.3d 842, 846 (7th Cir. 2001). Thor does not dispute that Bailey has experience relating to the technical workings of RVs. Thor concedes that Bailey's experience "likely endows Bailey with sufficient technical knowledge to render opinions about the presence of defects in a motorhome like the RV." (ECF 24 at 3). When evaluating a proffered expert who, like Bailey, is undisputedly qualified based on experience, the Court must ensure "the experienced

appraiser's opinion referenced their explanation of methodology and principles and that the conclusions are not based solely on subjective belief or speculation." *Pattee v. Nexus RVs LLC*, 2022 WL 834330, at *8 (N.D. Ind. Mar. 21, 2022) (citing *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010)). When it comes to nonscientific experts—like an appraiser—the test for reliability is "flexible." *Id.* (citing *United States v. Romero*, 189 F.3d 576, 584 (7th Cir. 1999)) (overruling objection based on lack of testable metrics because "not all admissible experts can be mechanically scrutinized in the same manner as scientific or technical experts").

Bailey's report details his findings related to purported defects in Greene's RV. (ECF 24-1 at 34-64). Bailey lists 24 variables that can affect an RV's value. (*Id.* at 57-58). His report also refers to the National Automobile Dealer Association ("NADA") guidebook, which he describes as the "generally accepted industry standard for guideline value only. It is not the Bible of the true value as it strictly [sic] a guide only." (ECF 24-1 at 56). His report concludes that after review of the RV manufacturer warranty, service history, his inspection findings of the defects, and consideration of the 24 variables, he opines that the fair market value of the RV if the defects were known at the time of sale to be $100,000.00.

Thor argues that, when Bailey was deposed and had to elaborate on those 24 variables and describe his methodology, Bailey's conclusions ultimately rest on Bailey's "say-so" and amounts to inadmissible *ipse dixit*. The Court agrees with Thor that, at times Bailey's testimony suggests that his conclusions are speculative. Bailey testified he relied on a "gut feeling" when evaluating a variable related to the ownership costs of

the RV. (ECF 24-1 28). Bailey also testified that his market supply and demand analysis was based in part on what he sees "on the road." (*Id*. at 26). If that was Bailey's sole testimony, it would not pass muster under Rule 702.

However, at Bailey's deposition, he does provide some additional explanation for his proffered opinions. He testified that several of the 24 variables did not factor into his valuation determination because they were not relevant. As mentioned, one variable Bailey did consider was market supply and demand. When questioned how he evaluated that variable, he testified that he's been in the business for over "45 years" that he has "seen units" and "used to work at one of the biggest dealerships and we had those. I know about them units. I know about the RVs and which ones sell and which ones don't." (ECF 24-1 at 26). Another variable Bailey considered was insurability risk. Bailey testified that he did not consult any insurance companies in reaching his determination, but that in his experience he has "dealt with insurance companies. I have dealt with them when I did work for the dealers and stuff selling trailers. I know that they won't insure a lot of these people if they find out that they have damage to them." (ECF 24-1 at 27). When discussing the economic cost—another valuation factor—Bailey testified that he considered the cost to fuel the RV given the present cost of $6 a gallon for gas and $7 a gallon for diesel, and the cost for bringing the RV back and forth to the dealership to get it fixed. (ECF 24-1 at 27-28). And when discussing another factor— prohibited use on highways—Bailey elaborated that it is his opinion that the RV's alleged defects to the electrical system make it dangerous to take on the highways. (ECF 24-1 at 29). Such a conclusion does not strike the Court as mere *ipse dixit*, particularly

9

because Thor does not challenge the admissibility of Bailey's opinions on the existence

of the alleged defects. (ECF 24 at 2). Bailey also testified that he considered whether the

RV could be financed based on his experience selling units and trying to get customers

financing. (ECF 24-1 at 30). While Bailey was unable to provide itemized deductions for

the factors he considered, this Court has held that itemized deductions are not required.

*Pattee*, 2022 WL 834330, at *8 (citing several cases from this District that allowed an RV

appraisal expert to simply present his final valuation after providing an overview of

specific factors he used).

It's a close call. But considering Bailey's testimony and report, Greene shows

more likely than not that Bailey's testimony is the product of reliable principles and

methods, and his opinion reflects a reliable application of the principles and methods to

the fact of the case under Rule 702. *See Hoopes v. Gulf Stream Coach, Inc.*, No. 1:10-CV-

365, 2016 WL 1165683, at *10 (N.D. Ind. Mar. 25, 2016) (citing *Metavante*, 619 F.3d at, 761

(7th Cir. 2010)) ("[A]ppraisals are not an exact science that can be mechanically

scrutinized; rather, as long as an explanation of the methodologies and principles

supporting the experienced appraisers opinion were referenced and the conclusions

were not based on subjective belief or speculation alone, the report passes muster.").

Thor's motion to strike is denied.

### B.  Thor's motion for summary judgment

Thor moves for summary judgment on all of Greene's claim, and raises several

arguments. First, Thor argues that Greene failed to exhaust the Limited Warranty's

back-up remedy. Second, Thor argues that Greene failed to provide Thor with a

10

reasonable opportunity to repair the RV. Third, Thor argues that Greene cannot prove damages. Fourth, Thor argues that Greene's Magnuson-Moss Warranty Act claim fails because the express and implied warranty claims fail. Finally, Thor argues that Greene's Indiana Deceptive Consumer Sales Act claim is not actionable because it is a mere rehashing of Greene's breach of warranty claim, and that Greene's Pennsylvania Unfair Trade Practices and Consumer Protection Law claim fails because the RV was sold in Indiana. Each will be addressed in turn.

### i.   Failure to exhaust backup remedies

The parties do not dispute that Indiana law applies. To prevail on a breach of warranty claim in Indiana, a plaintiff must prove (1) the existence of a warranty, (2) breach, (3) causation, and (4) damages. *Mathews v. REV Recreation Group, Inc.*, 931 F.3d 619, 622 (7th Cir. 2019). A warranty can be breached "[w]here circumstances cause an exclusive or limited warranty to fail of its essential purpose." Ind. Code § 26-1-2-719(2). A limited warranty does not fail of its essential purpose if a customer does not avail themselves of the contract's back-up remedy. *Mathews*, 931 F.3d at 622. However, a remedy will fail of its essential purpose "when an unexpected circumstance arises and neither party accepted the risk that such circumstance would occur." *Martin v. Thor Motor Coach Inc.*, 602 F. Supp. 3d 1087, 1093 (N.D. Ind. 2022) (quoting *Rheem Mfg. Co. v. Phelps Heating & Air Conditioning, Inc.*, 746 N.E.2d 941, 955 (Ind. 2001))

The Limited Warranty's primary remedy is a repair of any covered defects within ten days of discovery if the buyer notifies Thor or an authorized dealership of the defect and delivers the motorhome for repair. (ECF 27-2 at 21). The back-up remedy

11

states that "[i]f the repair remedy does not successfully cure a defect after a reasonable number of repair attempts," then the purchaser's "sole and exclusive remedy shall be to have TMC pay an independent service shop of the [purchaser's] choice to perform repairs to the defect OR if the defect is incurable, have TMC pay diminished value damages." (ECF 27-2 at 21) (emphasis in original).

Thor argues that Greene never availed himself of the back-up remedy because he never took his recreational vehicle to an independent repair shop of his choosing after Greene's primary remedy purportedly failed to cure the RV's defects. Greene argues that the back-up remedy failed of its essential purpose because the service providers of his choosing could not perform the repairs. According to Greene's deposition testimony, he called service providers who told him that they did not work on motor homes of that size or on electric issues. (ECF 27-1 at 17). Greene also presents a letter dated August 3, 2022 from him to Butler Service Center, an independent repair shop, requesting repairs.[5] (ECF 37-30). This case is therefore distinguishable from *Mathews* where there was no evidence the buyer made any attempt to avail themselves of the back-up remedy. 931 F.3d at 622. Viewing the evidence in the light most favorable to Greene and drawing all reasonable inferences in his favor, a reasonable jury could find that the back-up remedy failed of its essential purpose because the independent service shops of Greene's choice refused to repair his RV. *See also Neary v. Thor Motor Coach,*

---

[5] Thor argues that Greene asserting that he called Butler Service Center to request repairs is inconsistent with Greene's deposition testimony. The Court disagrees. Greene testified that he could not remember the names of the service repair centers he called at the time of his deposition. (ECF 27-1 at 17). Greene now identifying Butler Service Center as a repair center he called is not inconsistent with his testimony.

*Inc.*, 3:20-cv-338-RLM-MGG, 2022 WL 4080899, at *5 (N.D. Ind. Sept. 6, 2022) (Miller, J.) (denying summary judgment on breach of warranty claim where independent service shop could not perform repairs); *Morris v. Jayco, Inc.*, Case No. 3:22-cv-861, 2025 WL 26700, at *5 (N.D. Ind. Jan. 3, 2025) (Lund, J.) (same).

Greene has also presented evidence that he met his obligations under the back-up remedy by requesting Thor to pay diminished value damages for the incurable defects. It is undisputed that Greene sent Thor a letter stating that Greene believed his RV to be a fire hazard, that the defects are incurable because several defects remain despite several repair opportunities, and requesting Thor to pay diminished value damages. (ECF 37-29). Greene has also presented evidence from an expert opining that the RV is a fire hazard, and that Greene presented the defects for repairs on several occasions. Accordingly, Thor's motion for summary judgment based on Greene's purported failure to exhaust the back-up remedy is denied.

### C. Reasonable opportunity to repair

Next, Thor argues that Greene's breach of express and implied warranty claims fail because Greene did not provide Thor a reasonable opportunity to repair the defects. Under Indiana law, a buyer must give the warrantor a reasonable opportunity to repair the defects before bringing a breach of warranty claim. *Zylstra v. DRV, LLC*, 8 F.4th 597, 601 (7th Cir. 2021); *see also Mathews*, 931 F.3d at 622 (finding that a warranty cannot fail of its essential purpose if the warrantor is not given a reasonable opportunity to cure the defects). A "reasonable opportunity" to cure a defect means at least three chances. *Zylstra*, 8F.4th at 602.

Greene argues that the following defects were presented to Thor at least three times: no power from inverter, dash A/C not working, large slide out malfunctions, main storage compartments sagging, and fridge won't power on inverter. (ECF 38 at 11), so the Court starts with those. Greene alternatively argues that defects that were presented to Thor less than three times—specifically the low battery warnings, water heater inoperative, and entry step won't retract—constitute major defects, and Greene's failure to present those defects at least three times is not fatal to his breach of warranty claim. The Court will then address Greene's argument as to whether those defects are major defects.

### i. Defects purportedly presented at least three times

### 1. No power from inverter

As to the no power from inverter defect, the evidence shows that Greene first presented this defect when he took the RV to Camping World RV Sales – Indianapolis on December 30, 2021. (ECF 37-8). Greene presented the defect for repairs a second time on April 11, 2022, which Greene labels his second attempt. (ECF 37-10 at 1). On May 7, 2022, Greene took the RV home before repairs were completed so he could take it to Fyda Freightliner. Then on May 21, 2022, Greene returned the RV back to Camping World RV Sales Pittsburgh, and Greene asserts this marks the third attempt for Thor to make repairs to the no power form inverter. (ECF 27-1 at 47; ECF 37-15). Greene later picked up the RV from Camping World RV Sales Pittsburgh on May 24, 2022 so Greene could go on vacation with his family to Maine for about two weeks. Greene returned

the RV to Camping World Pittsburgh on July 6, 2022, and labels this as Thor's fourth attempt to repair the no power from inverter.

Thor disputes that Greene dropping the RV off on May 21, 2022 and July 6, 2022 constitutes as separate repair attempts, arguing that an interrupted service visit for the convenience of the customer does not multiply the number of repair attempts, and that Greene characterizing the May 21, 2022 and July 6, 2022 drop offs as separate repair opportunities is inconsistent with his deposition testimony. (ECF 41 at 6 n. 1).

The Seventh Circuit noted that "[a]s a legal matter, a purchaser has not given a warrantor a reasonable opportunity to repair if he appears at the doorstep of the manufacturer and demands repair in a timeframe that is not possible for the warrantor." *Zylstra*, 8 F.4th at 608. However, there is a dispute as to whether Thor faced such unreasonable time constraints as envisioned in *Zylstra*, and did not have a reasonable opportunity to repair the inverter when Greene picked up the RV before Thor completed repairs such that Greene returning the RV on May 21, 2022 and July 6, 2022 are not two separate repair opportunities. While perhaps Thor did not have a reasonable opportunity to repair the defect prior to Greene picking the RV up on May 7 and May 24, that is for a jury to decide.

Further, contrary to Thor's assertion, Greene's argument that the May 21, 2022 and July 6, 2022 returns to Camping World constitute separate repair opportunities is not inconsistent with Greene's testimony. Thor presents a Camping World Pittsburg work order that details the repairs from April 11, 2022 through July 11, 2022, and argues that this period reflects only one repair opportunity. Greene does testify that the work

order chronicles the repairs performed during that period. (ECF 27-1 at 14). But Greene also testified that his RV was not continuously at the dealer during that period, and questions why the repairs are on the same work order:

> Q: Now—but your RV was not continuously at the dealer that whole time, was it?
>
> A: The date – yeah, there was a couple of times, yeah. I was trying to get it—was trying to get it home because, obviously, we wanted to use it on our trips and we needed a couple of test trips prior to our big trip to make sure everything worked. So, yeah, it was in and out a couple of times.
>
> Q: Right. So you would take it out, use it, and bring it back for them to resume work on it?
>
> A: Well, and then, unfortunately, I think they probably should have created a new work order; but when I would bring it back, they just kept continuing to add to this work order.

(ECF 27-1 at 14-15).

Taking the evidence in the light most favorable to Greene, there is a genuine issue of material fact as to whether Thor had a reasonable opportunity to make repairs to the inverter defect at least three times—even if Greene decided to take the RV from the dealer and later return it. Thor's motion for summary judgment as to this defect is denied.

## 2. **Dash A/C**

As to the Dash A/C, Greene argues that he presented it for repairs four times. The first time was to Camping World RV Sales Pittsburg on April 11, 2022. (ECF 37-10 at 4). When Greene picked up the RV, he was informed that the dash A/C issues were a problem with Fyda Freightliner. On May 16, 2022, Fyda performed a repair of the dash A/C. (ECF 37-14). But Greene presents evidence that Fyda determined that the dash A/C was not working because there was a loose wire connection at the thermostat

switch, which was wiring installed by Thor. (ECF 37-14). Thor reimbursed Greene

$667.80 for the repairs done by Fyda. (ECF 37-1 at 6-7). Greene therefore argues the May

16, 2022 repairs by Fyda constitute a second repair opportunity of the dash A/C. Next,

Greene argues that the RV was presented to Camping World RV Sales Pittsburgh on

July 6, 2022 for repairs to the dash A/C, and presented evidence of an email confirming

an appointment for July 6, 2022, and a July 5, 2022 email from Greene to a Thor

representative attaching a list of the issues Greene found, including water from the AC

unit dripping, and informing Thor that he was dropping the RV off at Camping World

the next day. (ECF 37-18; ECF 37-24 at 5). Greene argues that this constitutes a third

repair attempt. Greene then presents an email dated July 11, 2022 in which an advisor

from Camping World told Greene that "[t]he unit is completed in regards to the work

we needed to complete. You are welcome to pick the unit up this week for Mr.

Greene[.]" (ECF 37-25). Greene picked up the RV, but returned the RV to Camping

World. On July 20, 2022, Camping World of Pittsburgh began a work order for some

repairs. (ECF 37-19). That repair order does not mention the dash A/C, but Greene

presents an email from Thor to Camping World dated July 15, 2022 asking if the team

can correct several issues, including the dash A/C not working, inferring that Camping

World was made aware of the defect when it began repairs on July 20, 2022. (ECF 37-

28). Greene argues that the July 15, 2022 return of the RV constitutes the fourth repair

attempt.

Thor argues that the return of the RV on the April 11, 2022, July 6, 2022, and July

15, 2022 are not repair attempts because Camping World did not actually work on the

dash conditioning any of those three times. But the issue is whether Greene *presented* the defect for repair on more than two occasions. *Kutz v. Jayco, Inc*. 738 F. Supp.3d 1035, 1038-39 (N.D. Ind. 2023) (citing *Zylstra*, 8 F.4th at 602)). Greene has put forth evidence that he had done so. Whether Thor had a reasonable opportunity to repair the dash A/C is a question for the jury.

### 3.  Slide out malfunctions

Next is the slide out malfunction. The first time Greene presented the slide out defect for repair was to Camping World RV Sales Pittsburg on April 11, 2022. (ECF 37-10 at 3). Greene asserts that it presented the RV a second time on July 6, 2022, which Thor disputes. (ECF 37-18; 37-24). The third attempt was on October 17, 2022 at camping World RV Sales Pittsburgh. Thor does not dispute that the October 17, 2022 visit could constitute as a repair opportunity.

As discussed, whether the return of the RV on July 6, 2022 constitutes a second reasonable repair opportunity, even if Greene decided to take the RV from the dealership for his own personal use, is a question for the jury. Accordingly, there is a genuine issue of material fact as to whether Greene presented the slide out malfunction at least three times.

### 4.  Main storage compartment sagging

As to the main storage compartment sagging, the first time Greene presented the defect for repair was to Camping World RV Sales Pittsburg on April 11, 2022. (ECF 37-10 at 2). Greene argues the second time was May 21, 2022 when he took the RV to Camping World RV Sales Pittsburgh. (ECF 37-15; ECF 37-1 at 7-8). Greene then

purportedly presented the defect for repairs a third time on July 6, 2022. (ECF 37-24 at 1, 37), which Thor also disputes for the same reasons already stated. Since there is a genuine issue of material fact as to whether Thor was given a third opportunity to make repairs when the RV was returned on July 6, 2022, summary judgment as to the main storage compartment sagging must be denied.

### 5. Fridge won't power on inverter

The first time Greene presented the defect for repair was to Camping World RV Sales Pittsburg on April 11, 2022. (ECF 37-10 at 1). Greene argues the second time was July 6, 2022 (ECF 37-24 at 2-3, 32; ECF 37-1 at 10). Greene then argues that the third time that he presented the defect of the fridge won't power on inverter was on July 15, 2022. In support, Greene presents the July 15, 2022 email from a Thor representative to Camping World RV Sales Pittsburgh asking if Camping World could get certain repairs done. One such request was a "Refer only works when plugged in and using the generator, will not work when using inverter." (ECF 37-28 at 10). It's unclear whether "refer" is referencing the refrigerator. Thor does not dispute that the July 15, 2022 email from Thor to Camping World requested service for the fridge not powering. (ECF 42 at 27). For the reasons already stated, taking the evidence and inferences in the light most favorable to Greene, there is a genuine issue of material fact as to whether Greene presented the defect to Thor at least three times.

### ii. Defects presented less than three times

As to the other remaining defects, Greene has not argued that they were presented at least three times. "[T]wo attempts at relatively minor repairs aren't enough

as a matter of law." *Massey v. Nexus RVs*, LLC 680 F.Supp. 3d 1051, 1062 (N.D. Ind. 2023) (citing *Mathews*, 931 F.3d at 622)). The Seventh Circuit held that "a reasonable opportunity to cure, at least in cases where the defects are somewhat minor, and not affecting full use of the vehicle, means at least three chances." *Zylstra*, 8 F.4th at 603 (citing *Mathews*, 931 F.3d at 622)). That said, the Seventh Circuit noted in *Zylstra* that it "reserve[d] judgment as to whether, in the case of a major defect that made the RV unusable in any manner, we would require the purchaser to present the vehicle three times." *Id.* at 602. The court declined to resolve whether a sewage leak that contaminated the RV was a major defect because the customer never presented the RV to the warrantor to repair that defect. *Id.*

Since *Zylstra*, the Court has addressed whether a defect was a major defect, permitting the customer to present the vehicle less than three times, on several occasions. In *Doman*, the Court found such a major defect existed when the RV was destroyed after bursting into flames. *Doman v. Heartland Recreational Vehicles, LLC*, No. 3:23-CV-218 JD, 2023 WL 6637619, at *4 (N.D. Ind. Oct. 12, 2023). In *Herriage*, the Court determined that mold growth resulting from water intrusion that caused the buyer to break out in hives and her eyes to swell when she entered the motorhome constituted a major defect that rendered the RV unusable. *Herriage v. Forest River*, 3:23-cv-6-JVB-AZ, 2025 WL 472251, at *5 (N.D. Ind. Feb. 12, 2025). On the other hand, the Court in *Massey* held an operable Bigfoot leveling system, which was only presented for repair two times, was not a major defect because the evidence only showed that the defect would not prevent full use, and only just unusable at times, particularly when the plaintiff

took the RV on a 10,000 mile-trip after discovering the issue. *Massey v. Nexus RVs,* LLC, 680 F. Supp. 3d 1051, 1062 (N.D. Ind. 2023).

In support of Greene's argument that the low battery warning, inoperative heater, and unretractable entry step are major electrical system defects, Greene presents his proffered expert's opinion that the defects stem from the RV's electrical system, the defects in the RV's electrical system are likely to cause a fire and make the RV unsafe, and that the RV should not be used. (ECF 37-46 at 45-57). Thor counters that there is evidence that such defects can be repaired, and disputes when the electrical circuits were disconnected. In viewing the evidence in the light most favorable to Greene, whether the defects stemming from the electrical system are major defects and Thor had a reasonable opportunity to repair is a question for the jury.

That leaves several defects that Greene does not argue were presented at least three times or constitute major defects. "[S]ingle and double presentations cannot form the basis of a claim of breach of warranty." *Zylstra*, 8 F.4th at 604. Since Greene offers no argument as to the other issues presented for repair less than three times, Thor's motion for summary judgment as to those defects is granted.

### D. Damages

Thor next argues that Greene cannot prove any damages; therefore, it is entitled to summary judgment. Specifically, Thor argues that the fair market value of the RV as warranted minus the fair market value as received is the only way Greene could present a triable damages claim, and Greene does not present any admissible evidence on the value of his RV.

A plaintiff must prove damages as an element of their claim. *Schroeder v. Barth, Inc.*, 969 F.2d 421, 423-424 (7th Cir. 1992). "When a plaintiff cannot establish damages with sufficient certainty to avoid speculation or conjecture by the jury, the defendant is entitled to judgment as a matter of law." *Shepard v. State Auto Mut. Ins. Co.*, 463 F.3d 742, 748 (7th Cir. 2006). One measure of damages for breach of warranty is "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been warranted, unless special circumstances show proximate damages of a different amount." Ind. Code § 26-1-2-714(2).

Bailey opines that, after considering the purported defects, the fair market value of the RV at the time it was purchased was $100,000.00. (ECF 24-1 at 60). For the reasons previously stated in the Court's discussion of Thor's motion to strike Bailey's valuation opinion, Bailey's opinion is admissible. Thor also argues that, even if Bailey's testimony is admissible under Rule 702, it cannot be replicated and fails to establish damages. Thor argues that, under the warranty guide, Greene agreed that any diminished value figure must be disclosed so the accuracy can be verified through replication. Thor asserts that Bailey's diminished value cannot be verified through replication, therefore his diminished value opinion cannot be used to determine the remedy for breach of warranty.

Even if the agreement between Thor and Greene is enforceable, Bailey's methodology can be replicated. Contrary to Thor's assertion that no formula or method applies to Bailey's computations, as the Court already detailed, Bailey's valuation opinion is derived from a consideration of 24 valuation factors and the defects he

22

observed during his inspection of the RV. While Thor disagrees with Bailey's conclusions drawn from the application of those valuation factors and his inspection, another expert could still replicate Bailey's methodology by considering and applying those same factors, and inspecting the RV. Accordingly, Greene has established evidence of damages sufficient for his claims to survive summary judgment.

### E.  MMWA

Thor also moves for summary judgment on Greene's MMWA claim. Greene's MMWA claim survives for the same reasons his breach of express and implied warranty claims do. The MMWA "does not provide an independent basis for liability; it only provides for federal jurisdiction for [the] state law claims." *Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir. 2001). An MMWA claim thus rises and falls with the underlying state-law claim. *Id.*; s*ee also* 15 U.S.C. § 2310(d). Greene's MMWA claim therefore survives summary judgment.

### F.  State-law deceptive consumer practices claims

Thor argues that Greene's third claim arising under the Indiana Deceptive Consumers Sales Act ("IDCSA"), Ind. Code § 24-5-0.5-1 *et seq.*, and the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. 201-1 *et seq.*, must be dismissed, but raises different arguments for each. The Court will address each in turn.

### i.  IDCSA claim

As to the IDCSA claim, Thor argues it must be dismissed because breaches of warranty or contract cannot support a IDCSA claim. Under IDCSA, a "supplier may not

commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction." Ind. Code 24-5-0.5-3(a). IDCSA then lists over forty acts that are deemed "deceptive," however those enumerated acts are non-exhaustive. Ind. Code § 24-5-0.5-3(b). There are two kinds of actionable deceptive acts. The first are uncured deceptive acts, which requires notice to the supplier but does not require a showing of an intent to defraud or mislead. Ind. Code § 24-5-0.5-2(7). There are also incurable deceptive acts, which do not require notice but require a showing of an intent to defraud or mislead. Ind. Code § 24-5-0.5-2(8). Thor does not argue that Greene failed to give Thor notice of any uncured deceptive act, or that Greene failed to show an intent to defraud or mislead for any incurable deceptive acts. Thor only argues that Greene's IDCSA claim fails because it is a mere rehashing of his breach of warranty claim.

"[T]he Indiana Supreme Court has stated that a breach of contract does not suffice to support a claim of false representation under the [IDCSA]." *Zylstra*, 8 F.4th at 610 (citing *McKinney v. State*, 693 N.E.2d 65, 73 (Ind. 1998)) (affirming summary judgment on an uncured deceptive act claim arising from a breach of express and implied warranty). *see also Litsinger v. Forest River, Inc.* 536 F. Supp. 3d 334, 361 (N.D. Ind. 2021) ("A misrepresentation about a warranty may prove deceptive, but not a mine-run breach of warranty.") (citations omitted).

Moreover, "[a] broken promise is not ipso facto a false representation." *McKinney*, 693 N.E.2d at 73 (allegations that "amount to an assertion that McKinney made promises—sometimes in the form of warranties and guarantees—and then failed to perform" did not state claims under IDCSA). The *McKinney* court further explained

that a "promise can be made without knowledge or reason to believe that it will be broken, but a statement that is false for purposes of the Act must be false when made" and that "unfulfilled promises can also support allegations of misrepresentation or misdescription of the product if the facts at the time support the conclusion that fulfillment of the promise was problematic." *Id.* Greene argues that Thor committed an unfair or deceptive act actionable under IDCSA in several respects.

The first is when Thor allegedly stalled, delayed, and failed to perform repairs at the Thor factory and return to Greene by July 29, 2022. Under the IDCSA, a deceptive act includes representations that "the supplier is able to deliver or complete the subject of the consumer transaction within a stated period of time, when the supplier knows or should reasonably know the supplier could not." Ind. Code § 24-5-0.5-3(10). In support, Greene presents an email dated May 4, 2022 from a Thor representative, Rick Koelndorfer, that he believes "the best option here is to bring your motorhome back to the factory. I can get you in and out right away and would be happy to reimburse you for the mileage." (ECF 37-21). Greene then responded to Thor's email, stating that "I would appreciate some attention this week to get this thing taken care of" and that "[a]fter the 4th of July weekend, I don't have any plans scheduled until July 29th. I am sure I will find more issues while we are gone as we will be spending a lot of time in the RV. I would like to take you up on your offer to get this thing back to the factory and have any remaining issues taken care of and have the entire unit looked over" and then said, "I need to have it back no later than July 29th so I have a few days to get it prepped and packed for our trip."(ECF 37-22 at 1-2). Greene submitted an affidavit where he

attests that Thor attempted to schedule a Thor factory repair before Greene took a trip to Maine on June 2, but "was unable to do so." (ECF 37-1 at 7). Greene also asserts that Thor informed Greene that the plan was then for Camping World RV Sales Pittsburgh to complete its repairs once parts arrived, and then the RV would be transported to the Thor factory for the remaining defects, which would take about a week. (ECF 37-1 at 8). Greene also asserts that Thor "promised" that the Thor factory repair would be completed and back with Greene before his July 29, 2022 trip. (*Id.*) Greene then presents emails from Greene to Thor and Camping World dated July 5, 2022 that says Greene would be dropping his RV at Camping World the next day for Camping World to finish its repairs, and to arrange for a pickup of the RV from Camping World to take to the Thor factory for additional repairs once Camping World finished its repairs. (ECF 37-24). Greene presents an email confirming an appointment with Camping World for July 6, 2022. (ECF 37-18). On July 11, 2022, Camping World emailed Thor stating that the Camping World repairs were done and that the RV was ready to be picked up and taken to the Thor factory for the remaining repairs. (ECF 37-25 at 1-2). Greene also presents a request for factory service appointment dated July 12, 2022 by a Thor representative. (ECF 37-27). On July 15, 2022, Thor contacted Camping World to inform them that a transport driver would be contacting them for pickup either that day or early the following week. (ECF 37-28 at 11). But then later that same day, Thor emailed Camping World to say that they would not have enough time to get his RV back to Greene, and asked if Camping World could look into some issues. (ECF 37-28 at 10). Greene then presents an affidavit where he asserts that the Thor representative told

26

Greene that he had "forgotten to schedule" the Thor factory repair, and it was too late to get the RV to the Thor factory before Greene's July 29, 2022 vacation. (ECF 37-1 at 10-11). Greene thus asserts that the evidence shows Thor committed an unfair or deceptive act when Thor allegedly stalled, delayed, and failed to perform repairs at the Thor factory and return to Greene by July 29, 2022. But the Court disagrees.

Greene presents no evidence to infer that Thor knew or should have known that Thor could not perform the repairs as promised by July 29, 2022. Even viewing the evidence in the light most favorable to Greene, the evidence shows that Thor broke its promise to make the factory repairs and deliver the RV back to Greene before July 29, 2022 because Thor did not have time to do it. There is no evidence to infer that Thor was aware that it could not fulfill its promise at the time it purportedly promised to return the RV to Greene by July 29, 2022. *See Litsinger v. Forest River, Inc.*, 536 F. Supp. 3d 334, 361 (N.D. Ind. 2021) "[T]hat a product suffers from an unforeseen defect, or even that the manufacturer proves unable to complete the warranted remedy of a repair, or perhaps that the repair occurs later than as promised in the warranty because of commercial reasons, or that any other number of warranty breaches occur doesn't mean that the supplier acted abusively or deceptively. The statute requires more.").

Next, Greene argues that Thor committed an unfair or deceptive act when it "failed to properly inspect the RV before it left the Thor factory and failed to complete electrical work."(ECF38 at 24). Whether Thor failed to properly inspect the RV before it left the Thor factory is a distinct act from whether Thor failed to complete electrical work, so the Court addresses the alleged conduct separately.

Thor's alleged failure to properly inspect the RV before it left the Thor factory does not strike the Court as a deceptive or unfair act. Rather, such conduct sounds more like negligence or a breach of warranty. A failure to inspect does not appear to constitute one of the enumerated deceptive acts provided in IDCSA. Greene also does not provide any additional explanation or authority that a failure to properly inspect an RV could constitute an unfair or deceptive act. Thor is therefore entitled to judgment as a matter of law as to Greene's IDCSA claim arising from Thor's alleged failure to inspect the RV before it left the Thor factory.

Next, Greene argues that reasonable minds could conclude that Thor's alleged failure to complete electrical work is an unfair or deceptive act. That conduct also strikes the Court as giving rise to a breach of warranty claim, which is not actionable under the IDCSA. *See Zylstra*, 8 F.4th at 610. However, in support of Greene's argument, he points to evidence that Greene inspected the RV at Camping World RV Sales Indianapolis before purchasing it, and found that the control panel said, "inverter disabled." (ECF 37-1 at 2). Greene asserts that Camping World RV Sales Indianapolis promised to have a technician repair the inverter and other problems while Greene signed the sales documents, and have the inverter running for him before he left on his drive back to Pennsylvania with his family, so Greene proceeded with the purchase. (*Id*.) After Greene signed the RV paperwork, Greene testified that Camping World RV Sales Indianapolis told Greene that the inverter was "fried." (*Id*.) Greene then asserts he told the salesperson to "shred the sales papers" and that he "was not taking the RV back to Pennsylvania" with him. (*Id*.) The sales manager then told Greene that he

28

promised to replace the inverter, and deliver the RV to Greene in Pennsylvania. (*Id*.)
The evidence therefore supports Greene's allegations in his complaint that Thor
mispresented the inverter failure to Greene at the time of sale through its authorized
dealer. (ECF 1 at 20-21).

Deceptive acts under IDCSA include such representations that a subject of a
consumer transaction "has sponsorship, approval, performance, characteristics,
accessories, uses, or benefits it does not have which the supplier knows or should
reasonably know it does not have" or "is of a particular standard, quality, grade, style,
or model, if it is not and if the supplier knows or should reasonably know that it is not."
Ind. Code §§ 24-5-0.5-3(b)(1)-(2). Viewing the evidence in the light most favorable to
Greene, there is a genuine issue of material fact as to whether Thor committed an unfair
or deceptive act by misrepresenting the inverter failure at the time of the sale through
its authorized dealer, and knew or should have known that the inverter had issues
before selling the RV to Greene, particularly when Greene has presented evidence that
Thor informed Greene of the inverter issues immediately after Greene purchased the
RV.

Greene also argues that Thor's "application" of the back-up remedy is unfair or
deceptive to Greene because it required Greene to present his RV for repair to an
independent repair shop of Greene's choice before filing suit when the only
independent repair shop of Greene's choice was unwilling to perform the repairs.
Greene presents no authority in support of its theory a warrantor commits an unfair or
deceptive act when its warranty includes a back-up remedy. Nor does Greene present

any evidence that Thor was aware or should have been aware that the independent repair shop of Greene's choice would be unwilling to do the repairs at the time the parties agreed to the back-up remedy. Thor is therefore entitled to judgment as a matter of law as to Greene's claim under IDCSA arising from the back-up remedy.

Lastly, Greene argues that Thor representative Rick Koelndorfer promised to pay $312.30 to cover the cost of fuel for the repair trips, but never sent a check for payment as promised. Greene presents no other argument or evidence that such conduct is a deceptive act actionable under IDCSA. Broken promises alone do not demonstrate a deceptive act, and there is no evidence that Thor's representative knew or should have known that Thor's fulfillment of the promise was "problematic" at the time it was made. *See McKinney*, 693 N.E.2d at 73. Thor is entitled to judgment as a matter of law as to this claim arising from the $312.30 payment.

### ii. Pennsylvania Unfair Trade Practices and Consumer Protection Law claim.

Finally, Thor argues—in a footnote in its conclusion section of its motion for summary judgment—that Greene's claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") must be dismissed because the RV was sold in Indiana. "We have often said that a party can waive an argument by presenting it only in an undeveloped footnote." *Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013) (collecting cases). The Court will nonetheless address Thor's argument because Thor cited some authority.

The UTPCPL makes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" unlawful. 73 P.S. § 201-3(a). "Unfair methods of competition" and "unfair or deceptive acts or practices" include "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi). The UTPCPL provides a remedy to Pennsylvania residents. *See Wolfe v. McNeil-PPC, Inc.*, 773 F. Supp. 2d 561, 574 (E.D. Pa. 2011).

Greene is a Pennsylvania resident. It is undisputed that Greene purchased the RV in Indiana. Greene alleges that Thor engaged in unfair or deceptive conduct while Greene was in Pennsylvania. Thor cites to *Danganan* in support, but *Danganan* held that a non-Pennsylvania plaintiff could bring a UTPCPL claim concerning an out-of-state transaction against a Pennsylvania business. *Danganan v. Guardian Prot. Servs.*, 645 Pa. 181, 193 (Pa. 2018). The court said nothing about whether a Pennsylvania resident could assert a UTPCPL claim against an out-of-state business. In *Lewis v. Bayer AG*, another case cited by Thor, the court denied certification of a class where the putative class members included non-Pennsylvania residents, and found that a conflict of law exists that the state of the sale had the most compelling interests in protecting consumers within that jurisdiction. 2004 WL 1146692, at *12 (Com. Plt. Ct. Phila. Co. 2004). In so holding, the court noted that state consumer protection acts, such as the UTPCPL, "are designed to protect the residents of the states in which a deceptive act occurs or the individual resides and therefore the state where the individual resides has an overriding interest in applying the law of that state." *Id.* Thor cites no case where a

court held a Pennsylvania resident could not pursue a UTPCPL claim concerning an out-of-state transaction against a non-Pennsylvania business, nor could the Court find a case. Because the UTPCPL is a remedial statute that "aims to protect the consumers of the Commonwealth against fraud and unfair or deceptive business practices," and, "[a]s such, it is to be construed liberally to effectuate that goal" *see Corsale v. Sperian Energy Corp.*, 374 F. Supp. 3d 445, 459 (W.D. Pa. 2019), the Court is not persuaded that Greene cannot assert a UTPCPL claim against Thor, particularly because Greene alleges conduct that occurred while Greene was in Pennsylvania.

In Thor's motion for summary judgment, it does not argue that there is no genuine issue of material fact as to whether Thor engaged in any actionable conduct under UTPCPL. Thor however raises new and undeveloped arguments in its reply brief, and argues that Greene's UTPCPL claim fails because of the choice-of-law provision in the Limited Warranty, which provides that any cases of action "arising out of or relating to this limited warranty" shall be governed by Indiana law. It is not obvious that Greene's claim under UTPCPL necessarily arises or relates to the Limited Warranty. In any event, Thor has waived this argument because it is raised for the first time in a reply brief and is undeveloped. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012).

And even applying the traditional choice of law rules of Indiana, as the forum state, does not necessarily foreclose Greene's UTPCPL claim. Indiana treats a consumer protection claim as a tort. *Andersen v. Thor Motor Coach, Inc.*, 402 F. Supp. 3d 467, 482 (N.D. Ind. 2019). Accordingly, "Indiana applies the choice of law doctrine of *lex loci*

*delicti* – the place of the wrong." *Id.* In *Andersen*, the Court concluded that Texas, rather than Indiana, was "better characterized as the place where deceptive trade practices and the resulting loss occurred" and permitted a claim under the Texas Deceptive Trade Practices Act to proceed, even when Indiana law applied to the breach of warranty claims. *Id.* Thor does not raise any argument that Pennsylvania law does not apply as to Thor's deceptive practices claim under traditional choice-of-law rules.

Thor also asserts for the first time in its reply brief that the UTPCPL claim fails for the same reasons that the IDCSA claim fails. This argument is also undeveloped and waived, particularly because UTPCPL and IDCSA encompass different categories of unfair or deceptive acts. *See In re Actiq Sales & Mktg. Pracs. Litig.*, 790 F. Supp. 2d 313, 320–21 (E.D. Pa. 2011) (explaining differences between UTPCPL and IDCSA).

## IV.    CONCLUSION

For the reasons discussed, Thor's motion to strike the proposed expert testimony of Dennis Bailey (ECF 23) is **DENIED**. Thor's motion for summary judgment (ECF 25) is **GRANTED IN PART** and **DENIED IN PART**.

The motion for summary judgment is **DENIED** as to Greene's breach of warranty claims derived from the no power from invert, dash A/C, slide out malfunction, main storage compartment sagging, and fridge won't power on inverter. The motion is also denied as to the low battery warning, inoperative heater, and unretractable entry step electrical defects. The motion is **GRANTED** as to all other defects. The motion is **DENIED** as to the MMWA claim.

The motion for summary judgment is also **DENIED** as to Greene's IDCSA claim derived from Thor allegedly misrepresenting the inverter failure at the time of the sale through its authorized dealer. The motion is **GRANTED** as to Greene's IDCSA claim derived from other alleged unfair or deceptive acts.

Finally, Thor's motion for summary judgment is **DENIED** as to Greene's UTPCPL claim.

SO ORDERED on March 28, 2025.

/s/ *Cristal C. Brisco*

CRISTAL C. BRISCO, JUDGE
UNITED STATES DISTRICT COURT